```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/12/2026
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
WOLFGANG WEISE,

               Plaintiff,

     -v-

U.S. DEPARTMENT OF STATE,

               Defendant.
------------------------------------------------------------------X

24-cv-5760 (LJL)

MEMORANDUM AND ORDER

LEWIS J. LIMAN, United States District Judge:

*Pro se* Plaintiff Wolfgang Weise ("Plaintiff") challenges the decisions of the United States Department of State to (i) revoke his passport and (ii) deny his application for a new one. Dkt. No. 1. The Government has moved for an order granting summary judgment in its favor and dismissing the complaint. Dkt. No. 36. The motion for summary judgment is granted in part and denied in part, and the Court will temporarily withhold decision on the remaining aspects of the motion pending the identification of *pro bono* counsel for Plaintiff.

## BACKGROUND

### I. The Repatriation Loan Program

This case concerns the statutes, regulations, policies, and procedures associated with "repatriation loans," which the State Department issues "to destitute citizens of the United States who are outside the United States" to assist them with returning to the United States. 22 U.S.C. § 2671(b)(2)(B). The issuance of these loans is governed by the State Department's Foreign Affairs Manual (the "FAM"), which "convey[s] codified information to Department staff and contractors so they can carry out their responsibilities in accordance with statutory, executive,

and Department mandates." *Straw v. U.S. Dep't of State*, 2020 WL 2490022, at *2 (D. Md. May 14, 2020) (quoting *Foreign Affairs Manual and Handbook*, U.S. Dep't of State, http://fam.state.gov/), *aff'd*, 813 F. App'x 108 (4th Cir. 2020). The underlying statute also imposes certain conditions on the loans, including that recipients sign a written agreement with a repayment schedule, that the State Department bar passports from being issued or renewed for individuals who are in default, and that the Government assess certain penalties and interest on outstanding debts. *See* 22 U.S.C. § 2671(d). The regulations indicate that adult U.S. citizens who have "not been found to be mentally incompetent by a court, but who exhibit[] irrational behavior suggesting possible mental illness or lack of comprehension, may execute" these loan agreements, whereas individuals who have been declared mentally incompetent by a court may not. *See* 7 FAM § 374.7-1(b), 374.7-2(c).

Issuance of the loans is purely discretionary and based on eligibility factors such as prior residence in the United States and medical status. *Id.* § 371(c). Recipients of the loans must qualify as "destitute," meaning they have: "little or no visible means of support or liquid assets (no job; no cash; no benefits or retirement check pending; no savings; no return ticket, no credit cards, etc.)"; "no family, friends, neighbors, employers, charitable groups, etc., willing and able to provide adequate financial assistance"; "inadequate food or shelter"; and "no funds available to them to pay for the cost of repatriation." *Id.* ¶ 373.2(b). The FAM provides that repatriation loans may be used to cover not only the citizen's transportation costs back to the United States, but also expenses "incidental to the return of the individual," *id.* § 371(i), including the travel costs of an escort, *id.* § 371(i)(6). Escorts "may be required" where the recipient is an unaccompanied citizen minor, physically or mentally disabled, or in other circumstances, such as where the individual is "a fragile, disoriented elderly citizen, etc." *Id.* § 374.4(a).

As the application form for these loans specifies, issuance of a repatriation loan carries with it certain collateral consequences related to the individual's passport. *See* Dkt. No. 35 ("Certified Administrative Record" or "CAR") at 12. First, 22 C.F.R. § 51.60 provides that the State Department "may not issue a passport" where an individual is in default on a repatriation loan. 22 C.F.R. § 51.60(a)(1).[1] This regulation codifies and mirrors the restriction on passports for individuals in default on repatriation loans that appears in the underlying statute, as indicated above. Section 51.60 further provides that the Department "may refuse to issue a passport" where an individual "has not repaid" a repatriation loan. *Id.* § 51.60(c)(2). The regulation therefore distinguishes between loans that are in default and those that have not been repaid, with the former categorically barring an individual from receiving a new passport and the latter leaving to the Department discretion whether or not to issue a passport. Second, 22 C.F.R. § 51.62, which governs the revocation or limitation of existing passports, provides that the State Department "may revoke or limit a passport" where the individual "may be denied a passport under 22 CFR 51.60." *Id.* § 51.62(a)(1). Thus, a passport may be revoked or limited where the individual is in default on, or has failed to repay, a repatriation loan. The FAM also indicates that when an individual receives a repatriation loan, the Department typically stamps the individual's passport to limit it for return to the United States only. *See* 7 FAM § 377(d). *But see* 8 FAM § 1303.2-1, 1303.2-3(2) (suggesting only that passports "may" be limited in certain circumstances, including where an individual has "fail[ed] to repay or make appropriate payments on a repatriation loan," and citing 22 C.F.R. § 51.60(a)(1)).

The regulations provide for internal administrative review of passport denials and

---

[1] The State Department may issue a limited-use passport in this circumstance "for direct return to the United States." 22 C.F.R. § 51.60(a)(1).

3

revocations in certain circumstances. *See* 22 C.F.R. § 51.70. An individual whose passport has been denied or revoked on the grounds that they have failed to repay a repatriation loan (*see* Section 51.60(c)) "may request a hearing to review the basis for the denial, revocation, or cancellation, provided that the Department receives such a request, in writing, from such person or his or her attorney within 60 days of his or her receipt of the notice of the denial, revocation, or cancellation." *Id.* § 51.70(a). On the other hand, an individual whose passport has been denied or revoked on the grounds that they are in default on a repatriation loan (*see* Section 51.60(a)), may not request such a hearing. *Id.* § 51.70(b)(1). More generally, State Department regulations authorize alleged debtors to "request a review within State of the existence or the amount of the debt" by the payment due date. *Id.* § 34.9.

## II. The Revocation and Denial of Plaintiff's Passport

Plaintiff is a naturalized U.S. citizen who in August 2016 was issued a U.S. Passport under his former name, Valery Katsnelson. CAR 9 (naturalization certificate); CAR 31 (passport); CAR 32 (certification of naturalization); CAR 33 (order granting name change). The passport expires on August 17, 2026. CAR 31.

An internal State Department cable dated January 9, 2023 and titled "Final Repatriation Report: VALERY KATSNELSON," indicates that in August 2022, Plaintiff sought assistance from United States consular officials with returning to the United States from Minsk, Belarus. CAR 18. The report states that Plaintiff had exhausted his cash savings and was unable to access his pension from Belarus. CAR 18. Plaintiff rejected the offer of a repatriation loan at that time, and, in October 2022, he was found living in Minsk's central train station. CAR 18–19. On December 6, 2022, Plaintiff reportedly again requested assistance with returning to the United States, and the State Department cable indicates that this time he did accept a repatriation loan.

4

CAR 19.  A repatriation loan application from December 27, 2022, bears Plaintiff's former legal name and an accompanying signature.  CAR 12–13.  The cable further provides that a loan of $6,000 was authorized to provide for Plaintiff's return to the United States, of which $5,951.17 was expended: $4,366.17 for plane tickets for Plaintiff and an escort from Minsk to Istanbul and from Istanbul to Newark, New Jersey; $150 for an immigration fine that Plaintiff owed; $318 for two nights of lodging for the escort; $725.50 in fees for the escort; and $276.50 for meals and other incidental expenses for the escort.  CAR 19.  The record contains two plane tickets in Plaintiff's name totaling €1,611.  CAR 14–17.  More than half of the $6,000 loan, then, was spent on the escort's fees and expenses, and the record offers no indication as to why an escort was provided, or if one was ever requested.  The cable indicates that Plaintiff returned to the United States on January 4, 2023.  CAR 19.  It also states that Plaintiff's passport was not canceled or limited in any way prior to his repatriation because the Consular Chief was based in Lithuania and could not travel to Minsk due to Russia's invasion of Ukraine.  CAR 19.  Plaintiff denies that he has ever applied for a repatriation loan, signed forms relating to the issuance of such a loan, or received money from the Department.  CAR 61–63.

On May 11, 2023, approximately four months after Plaintiff's return to the United States, the State Department mailed him a letter informing him that it had revoked his passport.  CAR 21.  The notice stated that the revocation was made pursuant to (i) 22 C.F.R. § 51.62(a)(1)—which, as a reminder, authorizes passport revocations when the conditions of 22 C.F.R. 51.60 are satisfied—and (ii) 22 C.F.R. 51.60(a)(1)—the mandatory "may not issue" provision dealing with repatriation loans that are in default.  CAR 21.  The notice explained that Plaintiff was "in default on repatriation loan number 2022395325," and that "[b]ecause [he was] in default [on the loan], U.S. Passport number [sic] is hereby revoked pursuant to 22 C.F.R. § 51.62(a)(1) and 22

5

C.F.R. 51.60(a)(1)." CAR 21. The notice went on to inform Plaintiff: "You are not entitled to a hearing under 22 C.F.R. §§ 51.70 through 51.74. 22 C.F.R. § 51.70(b)(1) states that a hearing is not provided in a case of an adverse passport action where the Department may only issue a passport for direct return to the United States, such as in this case." CAR 21.

The Government concedes that when it issued this notice, Plaintiff was not in default on the loan. Dkt. No. 37 at 5. Indeed, the Certified Administrative Record shows that the first bill the State Department sent to Plaintiff was on September 27, 2023, roughly four-and-a-half months later. CAR 23. That bill indicated a payment due date of October 27, 2023, and informed Plaintiff that he had a right under 22 C.F.R. § 34.9 to request an internal administrative review with respect to the existence of the debt or the amount of the debt. CAR 23. On October 30, 2023, the State Department sent Plaintiff a first notice of delinquency on the debt. CAR 26. That notice also specified that Plaintiff could seek internal administrative review regarding the existence or amount of the debt and, that if he did, all collection activity would be suspended while his request remained pending. CAR 26. The State Department sent a second notice of delinquency on November 29, 2023, with largely the same information, but without the sentence regarding Plaintiff's right to seek internal administrative review regarding the debt, and with a new amount owed based on the accrual of interest and administrative charges. CAR 27.

On December 20, 2023, Plaintiff reported his passport as lost, and he applied for a new one. CAR 28–30. On January 5, 2024, the State Department sent him a letter informing him that it could not process his application because he owed a balance on an existing repatriation loan in the amount of $6,011.09. CAR 53. The letter cites 22 C.F.R. § 51.60(c)(2)—the discretionary "may refuse to issue" provision dealing with unpaid repatriation loans—and states that if payment arrangements were not made within ninety days, the application would be denied. CAR

53. The State Department sent the same letter again on July 3, 2024, and August 9, 2024. CAR 56–60. On October 9, 2024, Plaintiff mailed a response letter to the State Department disputing his receipt of a repatriation loan. CAR 61–63. In the letter, Plaintiff states, among other things: "I never, ever used in my life repatriation loan"; "[I] never, ever signing any documents for spending this money for my repatriation, and you never, ever able to approve in any U.S. Court that I used this money"; "I used only money for deportation from Internal Ministry of Belarus, and there is no discussion about my repatriation loan at all." CAR 61–63. On October 18, 2024, the State Department sent Plaintiff a notice indicating that his passport application had been denied "because [he was] in default on an existing repatriation loan" and had been "unable to resolve this issue within the timeframe established in our prior correspondence." CAR 64. That letter cites 22 C.F.R. 51.60(a)(1). CAR 64.

## PROCEDURAL HISTORY

Plaintiff, who is self-represented, initiated this case by complaint on July 24, 2024. Dkt. No. 1. He generally challenges the revocation of his passport and the denial of his application for a new one. He asserts that without a passport he lacks identification and is subject to possible deportation and lack of access to benefits. *Id.* He further states that he is elderly and disabled and that this ordeal has caused him significant mental anguish. *Id.* On March 27, 2025, the State Department filed the Certified Administrative Record, *see* Dkt. Nos. 34–35, and on April 10, 2025, it filed the instant motion for summary judgment and to dismiss the complaint, *see* Dkt. No. 36, along with a memorandum of law in support of the motion, *see* Dkt. No. 37. In an order on November 4, 2025, the Court informed Plaintiff that he was in default in his response to the Government's motion for summary judgment and that he would be granted an extension until December 1, 2025, to respond. Dkt. No. 49. Plaintiff did not respond by that date. The Court

7

held a status conference on January 8, 2026, where it informed Plaintiff that he would have until the following week to respond to the Government's motion for summary judgment, but Plaintiff again filed no response. Minute Entry, Jan. 8, 2026. At the conference, Plaintiff indicated that he is currently homeless and unemployed and has no ability to repay the loan.

Although Plaintiff has not filed an opposition to the motion for summary judgment, he has filed motions for the appointment of *pro bono* counsel and to transfer venue to the District of Columbia. Dkt. Nos. 52–53. The Government opposes the venue motion. Dkt. No. 55.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009). At this stage, the Court must "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in his favor." *McElwee v. County of Orange*, 700 F.3d 635, 640 (2d Cir. 2012). "Where, as in this case, a motion for summary judgment is unopposed, the same standard of review applies." *Chepilko v. City of New York*, 2022 WL 4554961, at *2 (S.D.N.Y. Sept. 29, 2022).

The typical Rule 56 summary-judgment standard does not apply in cases challenging agency action under the Administrative Procedure Act ("APA"), as a district court in that circumstance "'sits as an appellate tribunal,' and '[t]he entire case on review is a question of law.'" *New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 516 (S.D.N.Y.

8

2019) (quoting *Koopmann v. U.S. Dep't of Transp.*, 335 F. Supp. 3d 556, 560 (S.D.N.Y. 2018)); *accord Mad River Glen Coop. v. Jaddou*, 712 F. Supp. 3d 485, 493 (D. Vt. 2024). "When an agency action is challenged under the APA, summary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the relevant APA standard of review." *New York*, 414 F. Supp. 3d at 516 (citation omitted). Summary judgment is "generally appropriate" in these cases because "the question whether an agency's decision is arbitrary and capricious . . . is a legal issue amenable to summary disposition." *Genc v. Renaud*, 715 F. Supp. 3d 189, 195 (D. Conn. 2024).

## DISCUSSION

*Pro se* litigants "are entitled to "special solicitude . . . when confronted with motions for summary judgment." *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988). In particular, their pleadings must be construed liberally to raise the strongest arguments they suggest. *Flores v. U.S. Dep't of Just.*, 391 F. Supp. 3d 353, 357 (S.D.N.Y. 2019) (citing *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)). Construing the pleadings in this case broadly in Plaintiff's favor, the Court understands his case primarily to raise two challenges to agency action under the APA—namely, the revocation of his passport and the denial of his application for a new one. The Court addresses those APA claims first before turning to the alternative claims suggested by Plaintiff's pleadings.

### I. The APA

"Under the APA, courts review agency action to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Town of Southold v. Wheeler*, 48 F.4th 67, 77 (2d Cir. 2022) (quoting *Friends of Animals v. Romero*, 948 F.3d 579, 585 (2d Cir. 2020)). Under this "narrow" standard of review, "a court will overturn an agency's

9

determination only when the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* (quoting *Karpova v. Snow*, 497 F.3d 262, 268 (2d Cir. 2007)). Courts reviewing agency actions under the APA are typically "limited to examining the administrative record to determine whether the agency decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Kakar v. U.S. Citizenship & Immigr. Servs.*, 29 F.4th 129, 132 (2d Cir. 2022) (quoting *Nat. Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 97 (2d Cir. 2001)).

"It is an axiom of administrative law that a court must rely only on the reasoning an agency proffered at the time it made its decision, not its backward-looking explanations during litigation." *Think Food Grp. v. Jaddou*, 762 F. Supp. 3d 377, 391 (D. Vt. 2025); *see also Kakar*, 29 F.4th at 132 ("[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019)); *Garland v. Ming Dai*, 593 U.S. 357, 369 (2021) ("[R]eviewing courts remain bound by traditional administrative law principles, including the rule that judges generally must assess the lawfulness of an agency's action in light of the explanations the agency offered for it rather than any *ex post* rationales a court can devise." (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 63 (1943)). The question is whether the agency permissibly exercised its discretion at the time of the relevant decision—not whether it could have, or whether it now can. *See Env't Health Tr. v. Fed. Commc'ns Comm'n*, 9 F.4th 893, 910 (D.C. Cir. 2021) ("[W]hen 'assessing the reasonableness of [an agency's action], we look only to what the agency said at the time of the [action] . . . ." (citation omitted)).

Under general principles of administrative law, the appropriate course when an agency has erred "is for the reviewing court, 'except in rare circumstances,' 'to remand to the agency for additional investigation or explanation.'" *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 587 (2025) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). A remand "may not be necessary when an agency's decision is supported by a plethora of factual findings, only one of which is unsound," or "[w]hen it is clear that the agency's error 'had no bearing on the procedure used or the substance of [the] decision reached.'" *Id.* at 590 (quoting *Mass. Trs. of E. Gas & Fuel Assocs. v. United States*, 377 U.S. 235, 248 (1964)). On the other hand, the Supreme Court has noted with approval Judge Friendly's observation that "[w]here the agency has rested decision on an unsustainable reason, the court should generally reverse and remand even though it discerns a possibility, *even a strong one*, that by another course of reasoning the agency might come to the same result." *Id.* (quoting H. Friendly, *Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders*, 1969 Duke L.J. 199, 222–25). Furthermore, the Supreme Court asserted in a decision just last Term that it is unaware of "any prior case in which we have held that the application of an erroneous understanding of the governing law was harmless because a subsequent agency decision shows that the agency would have reached the same result if it had applied the correct understanding of the law." *Id.* at 591.

The Second Circuit understands issues of remand and harmless error in the APA context similarly. It has suggested that the typical remedy upon discovery of a "serious legal error" committed by an agency is to vacate the agency's decision and "remand for a new assessment of the evidence and/or a new hearing." *Cao He Lin v. U.S. Dep't of Just.*, 428 F.3d 391, 401 (2d Cir. 2005). But remands may not be necessary where the agency rested its decision on an

11

acceptable independent basis, or where there "is no realistic possibility that the outcome would be different on remand." *Id.* at 401.

The Government concedes that APA review is available here with respect to both the revocation and denial decisions. Dkt. No. 37 at 13–14; *see also Saleh v. Pompeo*, 393 F. Supp. 3d 172, 178–81 (E.D.N.Y. 2019) (addressing passport revocation under the APA); *Jarbie v. Holder*, 2016 WL 8711449, at *4 (S.D.N.Y. Aug. 12, 2016) (addressing denial of passport under the APA), *report and recommendation adopted*, 2017 WL 111738 (S.D.N.Y. Jan. 11, 2017). The Court will therefore analyze the agency decisions for conformance with the APA.

### A. The Passport Revocation

The first agency action at issue is the State Department's May 11, 2023 decision to officially revoke Plaintiff's U.S. Passport. The Government admits that the reason provided in the notice of revocation—that Plaintiff was in default on his repatriation loan under 22 C.F.R. 51.60(a)(1)—was factually incorrect. Dkt. No. 37 at 5, 14 n.3. The State Department had not yet attempted to collect on the loan, and in fact would not attempt to do so for several months after the revocation decision. The first bill sent to Plaintiff indicated a due date of October 27, 2023. Section 51.62(a) of Title 22 of the Code of Federal Regulations provides that the State Department "*may* revoke or limit a passport" in certain circumstances, *see* 22 C.F.R. § 51.62(a)(1) (emphasis added), and premising a discretionary passport revocation on an event that has not occurred constitutes quintessential arbitrary and capricious agency action. The "general" remedy in such a circumstance is to vacate the relevant decision and remand to the agency for further consideration. *See Food & Drug Admin.*, 604 U.S. at 587. That is true even when there is a "strong" chance the agency might come to the same result. *Id.* at 590.

In a footnote, the Government argues that any error was harmless and that remand is

12

unnecessary because even if Plaintiff was not in default on his loan at the time of the revocation, the State Department was authorized to revoke his passport under a different provision, Section 51.60(c)(2), which applies to individuals who have not repaid a repatriation loan. Dkt. No. 37 at 14 n.3. Essentially, the Government argues no harm, no foul because it could have exercised its discretion on an alternative basis not mentioned in its notice of revocation. This argument presupposes that the agency would make the same decision as a matter of the exercise of its administrative discretion that it now makes through counsel in litigation. The Court cannot accept such a presupposition. The Government's position now represents a classic post-hoc rationalization offered in litigation to defend an otherwise obvious error, and this is not one of the "rare circumstances" in which remand following agency error would be unnecessary. *See Food & Drug Admin.*, 604 U.S. at 587. For one, it is clear that the agency action was not actually supported at the time by the alternative basis that the Government now advances. The notice of revocation offers one and only one reason for the revocation: Plaintiff's default on the loan. The notice not only repeatedly cites the regulation subsection dealing with loans in default (Section 51.60(a)(1)), but it states in no uncertain terms that the agency's decision was made "[b]ecause you are in default." CAR 21. The notice does not cite Section 51.60(c)(2), the regulation the Government now invokes.

Furthermore, contrary to the Government's suggestion, it is not "clear that the agency's error 'had no bearing on the procedure used or the substance of [the] decision reached.'" *See Food & Drug Admin.*, 604 U.S. at 590 (citation omitted). With respect to the procedures used, the notice of revocation specifically informed Plaintiff that he was "not entitled to a hearing" where he could contest the revocation, as the regulations state that "a hearing is not provided in a case of an adverse passport action" under Section 51.60(a)(1). CAR 21. But if the revocation

13

had been under Section 51.60(c)(2), Plaintiff *would* have been entitled to such a hearing. *See* 22 C.F.R. § 51.70 (providing for hearings where passports have been denied or revoked under Section 51.60(c)). As for substance, it is not obvious that the same decision would have been reached absent the error. Indeed, the regulations distinguish between loans in default and those that have simply not been repaid in a notable and important way: Individuals with loans in default "may not" be issued a new passport, whereas individuals whose loans are not in default "may" be issued a new one. *Compare id.* § 51.60(a), *with id.* § 51.60(c). That regulatory distinction reflects a commonsense understanding regarding the seriousness of failing to pay a loan once due and merely failing to repay a loan proactively before a due date.

In sum, the State Department acted arbitrarily and capriciously in revoking Plaintiff's passport based on the fact that his repatriation loan was in default, and that error cannot be considered harmless. The Government's motion for summary judgment with respect to this claim is denied.

### B. The Passport Application Denial

Plaintiff also challenges the denial of his application for a new passport, which constitutes a separate agency action reviewable under the APA. When the Government denied Plaintiff's application, it again cited Section 51.60(a)(1) in its notice, but at that point in time, Plaintiff's loan was potentially in default. CAR 64. The application denial therefore does not necessarily rest on the same faulty premise as the passport revocation.

In analyzing this claim, however, the Court would benefit from an adversarial briefing process, and given that the Court has already partly denied the Government's motion for summary judgment, the Court will withhold judgment on this claim pending the appearance of *pro bono* counsel for Plaintiff. Plaintiff has previously sought assistance from the Court

14

regarding the appointment of *pro bono* counsel to help him with his case. *See* Dkt. No. 52. The Court has deferred ruling on that motion, but it now grants the request. The Court finds that under the circumstances representation would promote efficiency and "lead to a quicker and more just result." *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986). Among other things, counsel would be able to greatly assist Plaintiff with presenting his case, sharpening the issues, and negotiating a possible settlement. *See Batista v. Leclair*, 2020 WL 8678076, at *2 (S.D.N.Y. July 8, 2020) (granting application for appointment of *pro bono* counsel for settlement discussions); *Villar v. City of New York*, 540 F. Supp. 3d 437, 441 (S.D.N.Y. 2021) (same).

Accordingly, the Court respectfully directs the Clerk of Court to attempt to locate *pro bono* counsel. It should be noted that the Court does not have the authority to "appoint" counsel, but instead, may only "request" that an attorney volunteer to represent a litigant *pro bono*. *Mallard v. U.S. Dist. Court for the S. Dist. of Iowa*, 490 U.S. 296, 301 (1989). There is no guarantee that a volunteer attorney will decide to take the case or that, should the services of the volunteer be declined, the Court will locate another. In either instance, Plaintiff should be prepared to proceed with the case without representation. If an attorney volunteers, the attorney will contact Plaintiff directly.

Plaintiff has also moved to transfer venue to the District of Columbia. Dkt. No. 53. Given that the Court has now partly denied the Government's motion for summary judgment and granted Plaintiff's request to seek the appointment of *pro bono* counsel, transfer would be inefficient and not promote the ends of justice. The request is denied.

## II.     Plaintiff's Other Claims

To the extent the complaint can be understood to raise other kinds of claims, those claims must be dismissed. Plaintiff seeks money damages against the Federal Government, but the

doctrine of sovereign immunity bars such suits except where the Government has specifically waived its immunity. *See County of Suffolk v. Sebelius*, 605 F.3d 135, 140 (2d Cir. 2010). The Government has not done so here. For one, money damages are not available under the APA. *Id.* And Plaintiff is not entitled to damages under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), because this is not the kind of case in which courts have authorized an implied damages remedy. *See Straw*, 2020 WL 2490022, at *11 (finding no *Bivens* liability in case involving repatriation loan). Moreover, Plaintiff has brought suit against a federal agency rather than individual agents, and the Supreme Court has declined to recognize a direct damages action against federal agencies. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 486 (1994). Plaintiff also cannot maintain an action for damages under the Federal Tort Claims Act ("FTCA"), as there is no indication that he has initiated the administrative claims process, which is a prerequisite to bringing suit. Federal agencies are also improper defendants under the FTCA. *Page v. Oath Inc.*, 2018 WL 1406622, at *3 (S.D.N.Y. Mar. 20, 2018), *aff'd sub nom. Page v. U.S. Agency for Glob. Media*, 797 F. App'x 550 (2d Cir. 2019) (summary order).

## CONCLUSION

The Government's motion for summary judgment is GRANTED IN PART and DENIED IN PART. The Court will for the time being withhold decision on the remaining issue raised by the Government's motion (i.e., denial of Plaintiff's passport application under the APA). The Government is directed to mail this Memorandum and Order to Plaintiff's last known address, as well as to any return address that Plaintiff has provided in prior correspondence with the State Department. The Clerk of Court is directed to email a copy of this Memorandum and Order to Plaintiff at vkatsnelson1951@gmail.com, the email address reflected in Dkt. No. 52. (Chambers will also email a copy of the Memorandum and Order to Plaintiff.) The Memorandum and Order

will also be available for Plaintiff to view in the Clerk's Office if he appears in person at the Court. **Plaintiff is encouraged to file a letter with the Court explaining the best ways for the Court and any potential *pro bono* counsel to get in contact with him.**

Plaintiff's request for assistance seeking *pro bono* counsel is GRANTED. The Clerk of Court is respectfully directed to attempt to locate *pro bono* counsel.

Plaintiff's motion to transfer venue is DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 52 and 53.

SO ORDERED.

Dated: February 12, 2026
      New York, New York

                                      LEWIS J. LIMAN
                                United States District Judge