# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

WOLFGANG WEISE,

        Plaintiff,

    vs.

U.S. DEPARTMENT OF STATE,

        Defendant.

**No. 24-cv-5760 (LJL)**
No. 26-cv-4422 (LJL) [related]

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

Introduction ...................................................................................................................... 1

Factual Background .......................................................................................................... 2

    I.    Relevant Context.................................................................................................. 2

    II.    Passport Revocation and Loan Collection Efforts ............................................. 5

    III.    New Passport Application and Denial .................................................................. 6

    IV.    Procedural History.............................................................................................. 7

Applicable Standards ....................................................................................................... 9

    A.    Standard of Review ............................................................................................. 9

    B.    APA-Related Standards ..................................................................................... 10

Argument ....................................................................................................................... 10

    I.    Plaintiff's Remedy On The Revocation Claim ................................................. 10

    II.    Application Denial ............................................................................................ 12

    A.    Final Agency Action......................................................................................... 12

    B.    Default ............................................................................................................... 13

    C.    WPC's Deficiency Letters and the October 18 Denial..................................... 14

    D.    Constitutional Violations (Due Process) ......................................................... 16

    III.    The Department's Remaining Arguments Are Unconvincing.......................... 18

    A.    Promissory Note/Contract Arguments.............................................................. 18

    B.    Presumption of Regularity................................................................................ 18

    C.    Precedent ........................................................................................................... 19

Conclusion ..................................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Al-Mashwali v. U.S. Citizenship & Immigr. Servs.,*
2025 WL 872089 (S.D.N.Y. Mar. 20, 2025) ................................................................................ 10

*Al-Saidi v. Noem,*
No. 23-CV-4979 (VSB), 2025 WL 959094 (S.D.N.Y. Mar. 31, 2025) ..................................... 10

*Alzokari v. Pompeo,*
973 F.3d 65 (2d Cir. 2020) ............................................................................... 9, 10, 11, 15, 17

*Am. Council of Learned Societies v. Nat'l Endowment for the Humanities,*
2026 WL 1256545 (S.D.N.Y. May 7, 2026) ................................................................................ 9

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ...................................................................................................................... 9

*Balderramo v. Go N.Y. Tours Inc.,*
668 F. Supp. 3d 207 (S.D.N.Y. 2023) .......................................................................................... 9

*Barrows v. Becerra,*
24 F.4th 116 (2d Cir. 2022) ........................................................................................................ 16

*Cap. Source, LLC v. Goldner Cap. Mgmt.,*
No. 24-CV-6284 (OEM) (JAM), 2026 WL 1694672 (E.D.N.Y. June 11, 2026) ...................... 18

*Cors v. United States,*
No. 12 CIV. 2265 LAK KNF, 2013 WL 6816696 (S.D.N.Y. Dec. 26, 2013) ........................... 19

*Dep't of Com. v. New York,*
588 U.S. 752 (2019) ............................................................................................................... 10, 14

*FDIC v. Giammettei,*
34 F.3d 51 (2d Cir. 1994) ........................................................................................................... 18

*Garland v. Ming Dai,*
593 U.S. 357 (2021) .................................................................................................................... 14

*Hadwan v. United States Dep't of State,*
139 F.4th 209 (2d Cir. 2025) ................................................................................................ 15, 16

*Hymas v. United States Dep't of State,*
No. 3:23-CV-00336-DCLC-JEM, 2025 WL 3650951 (E.D. Tenn. Dec. 17, 2025) ................. 19

*Kakar v. U.S. Citizenship & Immigr. Servs.,*
29 F.4th 129 (2d Cir. 2022) ................................................................................ 10

*Khotovitskaya v. Shimunov,*
723 F. Supp. 3d 235 (E.D.N.Y. 2024) ................................................................ 18

*Mathews v. Eldridge,*
424 U.S. 319 (1976) ........................................................................................... 16

*Mullane v. Cent. Hanover Bank & Tr. Co.,*
339 U.S. 306 (1950) ........................................................................................... 16

*New York v. Admin. for Child. & Fams.,*
No. 26-CV-172 (VSB), 2026 WL 673848 (S.D.N.Y. Mar. 10, 2026) ................ 12, 13

*Pacito v. Trump,*
169 F.4th 895 (9th Cir. 2026) .............................................................................. 2

*Robinson v. New York City Transit Auth.,*
2021 WL 4523675 (S.D.N.Y. Sept. 30, 2021) .................................................... 16

*Rusaviainvest, OOO v. Yellen,*
No. 18 CIV. 5676 (PGG), 2023 WL 6198256 (S.D.N.Y. Sept. 21, 2023) ................ 10

*Salazar v. King,*
822 F.3d 61 (2d Cir. 2016) ............................................................................ 12, 13

*SEC v. Chenery Corp.,*
318 U.S. 80 (1943) ............................................................................................. 14

*United States v. Phillips,*
2025 WL 2689614 (E.D.N.Y. Sept. 19, 2025) ..................................................... 9

*Weise v. U.S. Dep't of State,*
2026 WL 392433 (S.D.N.Y. Feb. 12, 2026) ....................................................... 15

*Yale-New Haven Hosp. v. Leavitt,*
470 F.3d 71 (2d Cir. 2006) ................................................................................. 14

**Statutes and Rules**

5 U.S.C. § 706(2)(A) ............................................................................................. 9

22 U.S.C. § 2671 ................................................................................................. 13

Fed. R. Civ. P. 56(a) ............................................................................................. 9

iii

**Regulations**

22 C.F.R. § 34.9 ................................................................................................ 6, 15

22 C.F.R. § 51.60(a)(1) ............................................................................ 5, 12, 13, 14

22 C.F.R. § 51.60(c)(2) ...................................................................................... 14

22 C.F.R. § 51.62(a)(1) ........................................................................................ 5

22 C.F.R. § 51.70(b)(1) ........................................................................................ 5

22 C.F.R. §§ 51.70–51.74 .................................................................................. 15

**Other Authorities**

*Default*, Merriam-Webster ................................................................................ 13

Human Rights Watch, Poland: Brutal Pushbacks at Belarus Border (Dec. 10, 2024) ................. 3

International Organization for Migration (IOM), Annual Report 2023 ..................................... 2

MASN Limited Liability Co., CARF Int'l .................................................................... 6

Plaintiff Wolfgang Weise ("Plaintiff" or "Weise") respectfully submits this memorandum of law in opposition to Defendant U.S. Department of State's (State Department) motion for summary judgment and motion to dismiss, *see* ECF Nos. 37, 79, and in support of his cross-motion for summary judgment.

### INTRODUCTION

This case returns to the Court regarding two agency actions—a passport revocation and the denial of a new passport application— premised on the same fundamental error.

First, the Court has already held that the Department violated the APA by revoking Plaintiff's passport before it had ever billed him on the underlying loan, so the only remaining question is the appropriate remedy. With Plaintiff's passport set to expire this month, the Court should order the Department to issue a new passport of limited validity to put him back in the position he occupied before the unlawful revocation.

Second, the application denial relies on the same faulty premise. Nine months before it ever sent Plaintiff any bill, the State Department effectively already treated him as in default— something that has followed him for years, through this litigation. Only after Plaintiff sued did the Department swap the legal basis for the denial from a discretionary nonpayment provision to a mandatory default provision that stripped him of any right to a hearing. That unexplained switch cannot be squared with the APA's requirement that agencies be held to the reasons they actually give, or with the Fifth Amendment's due process protections.

Perhaps recognizing as much, the Department retreats to contract-type arguments, invokes the presumption of regularity, and cites two inapposite cases involving materially different circumstances. None move the needle.

1

**FACTUAL BACKGROUND**[1]

## I.    RELEVANT CONTEXT

Plaintiff Wolfgang Weise—formerly named Valery Katsnelson—is a U.S. citizen born in 1951 in Khabarovsk, Russia.[2] CAR I at 18; CAR II at 58.  Up until in or around January 2017, Plaintiff was a resident of Colorado, living there for the past twenty years, up until the events that gave rise to this litigation. Then, Plaintiff traveled to Europe to spend time with family. He had been with a brother up until he was stranded.

State Department records show that a name check was conducted on Plaintiff on December 20, 2019, although it is unclear for what reason, if any. CAR II at 50. On or about March 12, 2021, Plaintiff contacted the Vienna consulate demanding to speak the Ambassador, alarmed about an intelligence conspiracy and trying to get back home to the United States. CAR II at 56. Shortly afterward, the Minsk Embassy suspended operations and relocated to Vilnius on February 28, 2022. CAR I at 19.

On or about June 1, 2022, without any U.S. resources on the ground in Minsk, Plaintiff turned to other organizations. He approached the International Organization for Migration ("IOM")—part of the United Nations and still operating in Minsk at the time—for help getting back to the United States.[3] Almost one month later, IOM successfully made a flight reservation

---

[1] "CAR I" refers to the certified administrative record filed in *Weise I*, No. 24-cv-5760. "CAR II" refers to the certified administrative record filed in *Weise II*, No. 26-cv-4422.

[2] Plaintiff legally changed his name to Wolfgang Weise by order of the Civil Court of the City of New York, certified August 21, 2023

[3] *See, e.g.,* International Organization for Migration (IOM), Annual Report 2023, IOM Doc. C/115/INF/1, at 24 (2024), available at https://publications.iom.int/system/files/pdf/pub2024-002-u-iom-annual-report-2023.pdf (last accessed Aug. 8, 2026); *see also Pacito v. Trump*, 169 F.4th 895, 914-915  (9th Cir. 2026) ("IOM is a nonprofit with which DOS contracts to

for Weise to return to the United States. That month, IOM booked him a flight to New York, first through Vilnius then Paris. CAR II at 75. Weise followed through, but his travel was cut short after he was denied entry at the Lithuanian border. He could not proceed and returned to Minsk and without much to do.[4]

Weise returned to Minsk and remained IOM-provided housing, which he was required to maintain as part of the country's legal requirements. CAR I at 18-19.  In the ensuing weeks— starting in August 2022— IOM began discussions with the U.S. Embassy about Weise's situation and asking for any assistance. *See* CAR II at 73-75, 89. Weise likewise renewed his requests and began reaching out to the U.S. Consulate again. *See, e.g.,* CAR I at 18 (Aug. 22, 2022 report from Plaintiff stating he exhausted his cash savings and could not access his U.S. pension).

IOM housed Plaintiff from approximately early August to late October 2022. *See* CAR I at 18-19. However, things fizzled when IOM later conditioned its helping Plaintiff with his agreeing to a medical examination/evaluation. CAR II at 67, 85.  He refused and, as a result, IOM ultimately withdrew services for Weise on September 22, 2022. *Id.*  On top of that, IOM also conditioned any further travel for Weise to be accompanied by a medical escort. *See, e.g.,* CAR II at 87 (IOM "deems [Plaintiff] too risky to fly without a medical escort, absent a medical evaluation").

---

coordinate travel for approved refugees and that serves as the RSC at certain overseas processing locations").

[4] The altercation resulted in a Lithuanian boarder guard "attack[ing] [Plaintiff] and punched him in the chest several times," and an x-ray later "confirmed injuries." *See* CAR II at 88; *see also* Human Rights Watch, *Poland: Brutal Pushbacks at Belarus Border* (Dec. 10, 2024), https://www.hrw.org/news/2024/12/10/poland-brutal-pushbacks-belarus-border (lasted accessed Aug. 10, 2026).

In the weeks that followed IOM's withdrawal, U.S. consulate staff again offered Weise a loan—and they did so on at least three separate occasions: September 23, September 29, and October 31, 2022. *See* CAR II at 66, 83, 84. And each time, Weise declined a loan. *Id.* He expressly said no to any loan if it involved an escort. *See, e.g.,* CAR II at 84 ("[Plaintiff] refuses to accept a loan if it would require an evaluation or escort"). Additionally, staff even resorted to trying to private funding sources, which all said the same thing ("cannot assist"). CAR II at 64.

Without anywhere to go or IOM's help, Plaintiff remained homeless. He lived at the Minsk central train station until his arrest. *See* CAR I at 19; CAR II at 84. He remained there until on or about November 10, 2022, when Belarusian authorities detained him for his repeated violations for failing to maintain his residence registration. CAR I at 19; CAR II at 93-95. He was taken to Akrestsina Detention Center, Minsk Facility where he would remain until he eventually returned to the United States (New York). During his time there in detention, U.S. consulate/staff visited Weise, where he requested their help in returning to the U.S. *See* CAR I at 19; CAR II at 82.

Eventually while still in detention, on or about December 27, 2022, a U.S. consular officer visited Plaintiff, at which point he agreed and signed a DS-3072 loan application. A $6,000 loan was approved that same day (Obligation No. 2022395325). *See* CAR I at 37-39; CAR II at 63, 80-81. The loan documents do not contain any section for an applicant to list an amount, and instead, the consular officer specifies the amount after the fact (in a separate section.) Nevertheless, several days later, on December 30, plane tickets were purchased for Weise and another individual (i.e., an escort) to travel from Minsk to New Jersey. CAR I at 14, 16; CAR II at 103, 105. Once released, Weise flew Minsk-Istanbul-Newark. CAR I at 19; CAR

II at 62, 107. He made the trip and arrived in the United States on January 4, 2023. *Id.* All told,

Plaintiff's total bill to the United States government was $5,951.17, broken down as follows:

- $4,366.17 for plane tickets for Plaintiff and an escort from Minsk to Newark, New Jersey;
- $150 for an immigration fine that Plaintiff owed;
- $318 for two nights of lodging for the escort;
- $725.50 in fees for the escort; and
- $276.50 for meals and other incidental expenses for the escort.

Of the almost six-thousand dollars, the escort represented over half of that amount: $3,968.23,

with $2,648.23 in flights and $1,320 in escort-related expenses. In short, roughly $4,000 of the

$5,951 debt belonged to the escort. Since then, Weise has remained in New York area, homeless,

and unable to travel. Before his repatriation, he never visited or had any ties to New York.

**II.    PASSPORT REVOCATION AND LOAN COLLECTION EFFORTS**

Plaintiff traveled using his U.S. passport (no. 550951785), which issued on August 18,

2016, and expires on August 17, 2026.

On or about March 27, 2023, Defendants first took steps to revoke Plaintiff's passport.

CAR II at 76 (internal memo "requesting revocation of… valid ppt"). Then, on or about May 11,

2023, the State Department formally revoked his passport by letter, citing 22 C.F.R. §§

51.62(a)(1) and 51.60(a)(1), as grounds for the decision. *See* CAR I at 21-22. "The Department

has been informed that you are in default," the letter added before explaining that Plaintiff would

not be entitled to any internal review under 22 C.F.R. § 51.70(b)(1). *Id.* at 1. Thus, the May 11

letter revoked Plaintiff's U.S. passport on the ground that he was in default on his repatriation

loan (no. 2022395325). CAR I at 21-22.

Importantly, however, the Department did begin any type of billing or collection on

Plaintiff's repatriation loan/account until at least September 27, 2023, when it issued its first

customer bill to Weise. CAR I at 23-25; *see* CAR II at 228-230. And it did not begin issuing

delinquency notices until shortly afterwards, as explained further below. Note that the customer

bill was mailed to an office suite in Baltimore, Maryland, associated with the International Social

Service ("ISS"), *see* CAR I at 19. That same address is currently registered to a mental health

treatment facility, with no apparent connection to ISS.[5] The Department subsequently issued two

delinquency notices to Plaintiff after that initial customer bill: once on October 30, 2023, First

Notice (CAR I at 26; CAR II at 231), and again on November 29, 2023, Second Notice (CAR I

at 27; CAR II at 232).

Together with the original customer bill, all notices related to the loan/billing went to an

office suite in Baltimore. Weise never received of them. Each explained that Weise could seek

internal review of "the existence or the amount of the debt" under 22 C.F.R. § 34.9, and that "all

collection activity would be suspended while his request remained pending." CAR I at 23, 26.

Needless to say, Weise did not respond to any of the Department's notices or correspondence.

### III.    NEW PASSPORT APPLICATION AND DENIAL

On or about December 1, 2023, Plaintiff submitted a new application for a passport,

including a DS-11 and DS-64 (application no. 621274998). CAR I at 28-30. At first, it appeared

that the application was held up based on some delay. *See* CAR I at 53-54. In a letter, dated

January 5, 2024, the Western Passport Center ("WPC") wrote: "[W]e are unable to finish

processing your application because you owe a balance on an existing repatriation loan." CAR I

at 53-54. Two more WPC letters followed—dated July 3 and August 9, 2024—each stating the

---

[5] *MASN Limited Liability Company*, CARF Int'l, https://carf.org/provider/masn-limited-liability-company-413218/ (last visited Aug. 11, 2026).

same thing and, more important, giving 90 days for Plaintiff to arrange repayment. *See* CAR I at 53, 56, 59.[6]

Plaintiff protested the debt in letter to WPC on October 9, although he did not receive a response. Instead, the Department issued a formal denial by letter on October 18, 2024. CAR I at 64. On top of that, in the last WPC deficiency letter, the Department gave Plaintiff until November 7, 2024, *i.e.,* 90 days, to make "payment arrangements" or otherwise have his application denied. However, only twenty days later, the State Department formally denied Plaintiff's passport application by letter dated October 18, 2024. CAR I at 64. The Department did not respond or address any of the allegations in Plaintiff's October 9 letter.

Meanwhile, Plaintiff's debt was also referred to the Treasury Department, *see* CAR II at 233 (Feb. 8, 2024), which would eventually prompt the garnishment of his Social Security benefits starting on June 3, 2024. Until this Court's intervention, for the months that followed, the Department continued to garnish Plaintiff's retirement, yielding an aggregate of $3,730 taken from Plaintiff's Social Security benefits. CAR II at 234.

IV.    **PROCEDURAL HISTORY**

On July 24, 2024, Plaintiff commenced this action, *Weise I*, by a complaint filed *pro se* challenging the denial of his passport application, among other things. *See* ECF No. 1. The Court granted Plaintiff leave to proceed in forma pauperis on August 5, 2024, ECF No. 4, and issued an order of service on November 25, 2024, ECF No. 13. The action was initially assigned to Chief Judge Swain and was reassigned to this Court on November 22, 2024. Plaintiff made numerous

---

[6] Plaintiff responded to WPC's correspondence by letter dated October 9, 2024, disputing any repatriation loan. CAR I at 61-63; see id. ("I never, ever used in my life repatriation loan"). CAR I at 64. He did not receive any response, however, and his passport application was denied about a week later on October 18.

pro se filings in the ensuing months, including letters to the Court, *see, e.g.,* ECF Nos. 5–11, 14, 17, 25, 29, 31, as well as three applications for pro bono counsel, ECF Nos. 23, 44, 52. The Court denied the first application without prejudice on February 14, 2025, ECF No. 27, and terminated the second on November 4, 2025, ECF No. 49.

On March 27, 2025, the Department filed the certified administrative record. *See* ECF Nos. 34 (redacted) & 35 (unredacted). On April 10, 2025, it moved for summary judgment and to dismiss the complaint, *see* ECF Nos. 36-37. At an initial pretrial conference on April 23, 2025, the Court gave Plaintiff until May 23, 2025 to file an amended complaint, although none was filed, and the Court extended Plaintiff's deadline to oppose the summary judgment motion to December 1, 2025. ECF No. 49.

On February 12, 2026, the Court issued an opinion, ECF No. 61, granting in part and denying in part the government's summary judgment motion. The Court construed Plaintiff's complaint as challenging (1) the revocation of his passport and (2) the denial of his application for a new passport. *Id.* at 12. On the first point, the Court found against the government, holding that "the State Department acted arbitrarily and capriciously in revoking Plaintiff's passport based on the fact that his repatriation loan was in default." *Id.* at 14. On the second point, the Court withheld judgment pending appointment of pro bono counsel and an opportunity for adversarial briefing the parties. *Id.* at 14-15.

On March 25, 2026, undersigned counsel entered an appearance in this instant litigation (24-cv-5760) on Plaintiff's behalf. Through counsel, Plaintiff also commenced the related action (26-cv-4422) challenging the validity of the underlying loan and, *inter alia*, seeking a restraining and preliminary injunction to stay the Department's garnishment of Plaintiff's Social Security benefits. The Court granted that request and, on consent, later entered a preliminary injunction

against the Department. *See* ECF Nos. 74, 77. The Court also entered a briefing schedule in both cases. The Department filed its supplemental memorandum of law on July 28, 2026, ECF No. 79, and Plaintiff's cross-motion and opposition follow.

**APPLICABLE STANDARDS**

### A.  Standard of Review

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see United States v. Phillips*, 2025 WL 2689614, at *4-5 (E.D.N.Y. Sept. 19, 2025) (collecting cases).

Since the Department partially moved to dismiss the complaint, *see* ECF No. 37 at 1, a reviewing court "construe[s] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Alzokari v. Pompeo*, 973 F.3d 65, 67 n.1 (2d Cir. 2020) (cleaned up) (citation omitted). As relevant here, on cross-motions for summary judgments, a court applies the same standard of review and "reviews each party's motion on its own merits and draws all reasonable inferences against the party whose motion is under consideration." *See Balderramo v. Go N.Y. Tours Inc.,* 668 F. Supp. 3d 207, 219-220 (S.D.N.Y. 2023) (cleaned up); *Am. Council of Learned Societies v. Nat'l Endowment for the Humanities*, 2026 WL 1256545, at *19 (S.D.N.Y. May 7, 2026) (same).

//

//

### B. APA-Related Standards

The Administrative Procedure Act ("APA") authorizes a court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "An agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Alzokari*, 973 F.3d at 70 (citation omitted); *see Al-Mashwali v. U.S. Citizenship & Immigr. Servs.*, 2025 WL 872089, at *3 (S.D.N.Y. Mar. 20, 2025) (citing *Kakar v. U.S. Citizenship & Immigr. Servs.,* 29 F.4th 129, 132 (2d Cir. 2022)). "This reflects the 'settled proposition' that 'in reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record.'" *Kakar,* 29 F.4th at 132 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019)).

"In a case involving review of a final agency action under the APA, however, "the usual Rule 56 summary judgment standard does not apply [] because 'the district judge sits as an appellate tribunal,' and [t]he entire case on review is a question of law.'" *Rusaviainvest, OOO v. Yellen*, No. 18 CIV. 5676 (PGG), 2023 WL 6198256, at *4 (S.D.N.Y. Sept. 21, 2023) (cleaned up) (collecting cases); *see, e.g., Al-Saidi v. Noem*, No. 23-CV-4979 (VSB), 2025 WL 959094, at *2 (S.D.N.Y. Mar. 31, 2025).

<u>**ARGUMENT**</u>

### I.    <u>PLAINTIFF'S REMEDY ON THE REVOCATION CLAIM</u>

The State Department had already revoked Plaintiff's passport before it had taken *any* action or effort to collect or bill him for an alleged loan. An internal State memo referred

Weise's passport for revocation on March 27, 2023, followed by a formal letter on May 11, 2023. Yet the Department did not issue the first bill for that loan until September 27, 2023. The Court had recognized as much in *Weise I,* holding that the Department's revocation violated the APA. Thus, given the Court has already decided the question of liability, the only remaining question is remedy.

The passport in question is set to expire this month on August 17, 2026. When Plaintiff filed his complaint in July 2024, he would have had another two years to use or travel with his valid passport. By this point, however, that passport will expire, leaving Plaintiff in the same position as before. Merely returning or reinstating that passport now would provide no meaningful relief. Since money damages are prohibited against the government in the APA context, the appropriate remedy would be to remand with instructions for the State Department to issue Plaintiff a passport with limited validity—about two years—which represents the time Plaintiff would have had to travel before this litigation.

In addition, the Department should take any steps to restore Plaintiff to restore Plaintiff to the position had the revocation never occurred. Among other things, the Department should ensure that it has taken steps to mitigate collateral consequences of revocation (e.g., flags in databases like the Consular Lookout and Support System (CLASS), visa applications, security screening, or international travel). The replacement passport—even if limited in duration—would also permit Plaintiff to pursue renewal through the ordinary process upon its expiration. *See, e.g., Alzokari*, 973 F.3d at 73 (directing the government to return plaintiff's already-revoked passport so that he may apply for a new passport "if he so chooses").

For more than two years, the unlawful revocation has prevented Plaintiff from traveling internationally. Unless the remedy accounts for the passport validity he lost and eliminates the

revocation's continuing collateral consequences, Plaintiff will remain in the same position he occupied when this litigation began.

## II.  APPLICATION DENIAL

### A.  Final Agency Action

The Department did not formally deny Plaintiff's passport application until October 18, 2024. The October 18 letter is the only and first ever invocation of the mandatory provision under § 51.60(a)(1). Before that, WPC's three deficiency letters—dated January 3, July 3, and August 9, 2024—all proceeded under the discretionary "loan not repaid" provision, § 51.60(c)(2). Nothing in the record suggests that any new fact came to light between WPC's August  letter and the October 18 decision. That mismatch raises a threshold issue: What constituted final agency action for purposes of the APA? It is unclear whether the operative decision was the October 18 letter, the WPC letters that preceded it, or other internal memoranda/notes that suggest the Department already made up its mind well over a year earlier.

An agency action is final when it satisfies two conditions. First, it "must mark the 'consummation' of the agency's decisionmaking process." *New York v. Admin. for Child. & Fams.*, No. 26-CV-172 (VSB), 2026 WL 673848, at *14 (S.D.N.Y. Mar. 10, 2026) (citation omitted). Second, it must be an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id*. (citations omitted) (cleaned up). "For the second prong, the core question is whether the result of the agency's decisionmaking process is one that will directly affect the parties." *Salazar v. King*, 822 F.3d 61, 82 (2d Cir. 2016) (internal quotation marks omitted).

True enough, the October 18 letter would ordinarily constitute final agency. However, the Department's internal records indicate that it placed Plaintiff in default before the loan had even

finished being disbursed and reconciled, and nine months before it ever sent him a bill. *See Salazar*, 822 F.3d at 83–84 ("The APA does not require that the challenged agency action be the agency's final word on the matter for it to be 'final'"). On December 29, 2022, before the loan had been fully disbursed and before any repayment obligation had arisen, the Department entered a "D" notation under Plaintiff's name in the CLASS database. *See* CAR I at 19. That notation was not merely trivial. The Department thereafter treated "loan recipient" and "debtor in default" as interchangeable and sought revocation of Plaintiff's passport in March 2023—approximately six months before it issued its first bill on September 27, 2023. The notation therefore constituted the Department's final determination of Plaintiff's status during the period before any later decision. The APA does not require an agency action to be "the agency's final word on the matter" if the action conclusively determines the parties' rights in the interim. *Salazar*, 822 F.3d at 83–84; *see also New York*, 2026 WL 673848, at *14-15.

### B.  Default

Beyond the finality problem, the Department's decision also fails because the record does not establish that it made a valid determination that Plaintiff was in default. Instead, the Department appears to have presumed default before any payment became due, or even before he was back in the country.

Taking a step back, part of the problem is that there is no legal or established rule in defining what "default" means. Neither § 51.60(a)(1) nor 22 U.S.C. § 2671 defines the term, and the regulations do not fill the gap either; *see Default*, Merriam Webster ("to fail to perform, pay, or make good"), https://www.merriam-webster.com/dictionary/default.  At a minimum, a valid default determination requires an enforceable repayment obligation, an ascertainable amount and due date, and a failure to satisfy that obligation when due.

The Department's own timeline illustrates the problem. It first billed Plaintiff on September 27, 2023, with payment due on October 27, 2023. After Plaintiff did not respond, the Department issued delinquency notices on October 30 and November 29, 2023, and referred the alleged debt to Treasury in February 2024. That sequence of events might support a prospective default determination. It cannot, however, retroactively validate the default entered in December 2022 or the Department's treatment of Plaintiff as in default beginning in March 2023.

The Department is therefore faced with a *Chenery* problem. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). Agency action must be judged according to the rationale the agency actually invoked when it acted, "rather than any ex post rationales a court can devise." *New York*, 2026 WL 673848, at *19 (quoting *Garland v. Ming Dai*, 593 U.S. 357, 369 (2021)); *see also Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 81-82 (2d Cir. 2006). If the stated basis was wrong, the government doesn't get to retroactively swap in a different rationale to make the action lawful. *See Dep't of Com.*, 588 U.S. at 780.

Further complicating things is what happened since then—that is, Treasury began deducting from Plaintiff's Social Security benefits on June 3, 2024, and continuing monthly offsets have since returned nearly $4,000 toward the debt. Yet if a majority of the loan has already been repaid, through a mechanism the Department itself controls, it is difficult to see how the loan remains "in default" in any meaningful sense. At the very least, then, the Department's default determination rests on an unexplained or unauthorized amount, which reinforces Plaintiff's arbitrary-and-capricious arguments.

### C.  WPC's Deficiency Letters and the October 18 Denial

Separate from the finality and default issues outlined above, the WPC's letters bring to bear another defect in the Department's decisionmaking. As mentioned, the WPC letters all

invoked § 51.60(c)(2), which gives the Department discretion to deny a passport when a repatriation loan has not been repaid. The October 18 denial, by contrast, invoked § 51.60(a)(1), which categorically prohibits issuance when such a loan is in default. The Department never acknowledged or explained that change—and it made the change only after Plaintiff filed this litigation.

As this Court has already recognized, "the regulation therefore distinguishes between loans that are in default and those that have not been repaid, with the former categorically barring an individual from receiving a new passport and the latter leaving to the Department discretion whether or not to issue a passport." *Weise v. U.S. Dep't of State,* 2026 WL 392433, at *2 (S.D.N.Y. Feb. 12, 2026). Meaning, Plaintiff had reason to believe that the Department retained discretion to issue his passport and that he could obtain administrative review under 22 C.F.R. §§ 51.70–51.74. The Department switched to (a)(1)— cutting Plaintiff out of any hearing right— only in the final denial, and never explained the switch. It never offered an explanation.

Moreover, the dates and timing of the WPC letters are equally problematic. Each WPC letter gave Plaintiff 90 days to make repayment arrangements. Although WPC never clarified which 90-day period controlled, its final letter, dated August 9, 2024, appeared to give Plaintiff until approximately November 7, 2024. The Department nevertheless denied his application on October 18 (three weeks before that period ended).

Separately, the Department's own billing notices create only more confusion. Those notices told Plaintiff he could seek internal review of "the existence or the amount of the debt" under 22 C.F.R. § 34.9, and that "all collection activity would be suspended." CAR I at 23, 26. Plaintiff's October 9 letter reads as a § 34.9 request. Yet the Department denied his passport application only nine days later, while that dispute remained pending, without acknowledging or

responding to his submission. In doing so, the Department "entirely failed to consider an important aspect of the problem." *Hadwan v. United States Dep't of State,* 139 F.4th 209, 220 (2d Cir. 2025) (quoting *Alzokari*, 973 F.3d at 70).

Taken together, the Department's unexplained, conflicting shifts underscore that the denial was not the product of reasoned decision-making.

### D. Constitutional Violations (Due Process)

Apart from the APA, the Department's decision-making presents an independent due process violation. Plaintiff maintains a Fifth Amendment right to due process. Here, by denying his passport application without providing "an opportunity to be heard at a meaningful time and in a meaningful manner," the Department deprived him of that interest without due process. *Hadwan*, 139 F.4th at 227 (cleaned up).

Three separate reasons confirm as much. *First,* the Department's billing notices related to the loan all went to the wrong address—an ISS office, see above—and never reached Plaintiff. *See, e.g., Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306, 314 (1950) (explaining "fundamental requirement of due process… is notice reasonably calculated, under all the circumstances, to apprise interested parties… and afford them an opportunity to present their objections"); *cf. Robinson v. New York City Transit Auth.*, No. 2021 WL 4523675, at *10 (S.D.N.Y. Sept. 30, 2021), adhered to on reconsideration, 2022 WL 220169 (S.D.N.Y. Jan. 24, 2022) (discussing due process and address-related considerations).

*Second*, the Department never considered Plaintiff's October 9 dispute letter before denying his application nine days later. He therefore received neither notice before the default nor serious consideration of his objections afterward, all of which ran afoul of Plaintiff's

procedural due process. *See Barrows v. Becerra*, 24 F.4th 116, 140 (2d Cir. 2022) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

*Third*, the revocation was ultimately premised on § 51.60(a), even though that provision afforded Plaintiff no administrative hearing or review. By changing the basis for denial only in its final decision, the Department deprived Plaintiff of the very procedure it originally promised.

Putting all of that together, Plaintiff thus received neither the process contemplated by the Department's regulations nor the process required by the Fifth Amendment. The Department provided no meaningful notice, no opportunity to contest the debt before imposing adverse consequences, and no explanation for multiple discrepancies. If the denial were permitted to stand, Plaintiff would remain in the untenable position as the *Alzokari* plaintiff. 973 F.3d at 73 ("If the Department's revocation were to stand, [Plaintiff] would be left in an untenable position: His claim of citizenship is unquestioned and yet he is forbidden from leaving the country…"). In sum, even setting the APA and regulatory arguments aside entirely, the due process violation stands on its own as an independent ground for relief.

Finally, notwithstanding, even if Plaintiff prevails on his denial claim, it is not clear he has an adequate remedy: remand to the agency would likely just result in the same denial. Should the Court find the revocation violates the APA, Plaintiff respectfully requests that the Court vacate the denial and equitable relief as described above, including issuance of a replacement passport that will permit him to resume international travel and later seek renewal through the ordinary process. *See Alzokari*, 973 F.3d at 73. However, because the related litigation (*Weise II*) separately challenges the validity of the underlying loan itself, the Court does not need to reach any of these questions if it concludes the loan is legally defective or unenforceable in the first place in *Weise II*.

### III.    THE DEPARTMENT'S REMAINING ARGUMENTS ARE UNCONVINCING

#### A.  Promissory Note/Contract Arguments

The Department argues that Plaintiff is responsible because of a valid, signed loan agreement (the promissory note), and that his failure to pay it put him in default. But there can be no default without, as a threshold matter, a valid promissory note in the first place.[7]

As a general matter, a promissory note, like any contract, is enforceable only upon "proof of the note" establishing its essential terms. *See, e.g., Cap. Source, LLC v. Goldner Cap. Mgmt.*, No. 24-CV-6284 (OEM) (JAM), 2026 WL 1694672, at *6 (E.D.N.Y. June 11, 2026) (citing, *inter alia*, *Khotovitskaya v. Shimunov*, 723 F. Supp. 3d 235, 242 (E.D.N.Y. 2024)).

Applying these standards, the Department's contract-based arguments fail. Here, there is no way to tell if the $6,000 amount was added, say, before or after Plaintiff supposedly executed the agreement. FDIC v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994) ("complete failure of proof concerning an essential element… necessarily renders all other facts immaterial"). And, according to Weise, he was never informed that any loan had been taken out in his name, let alone a $6,000 loan. Plus, an applicant is supposed to leave the amount section blank for the consular officer to complete later, according to the form's own instructions. It is thus unclear what process, if any, was followed here, especially since Plaintiff has no recollection of agreeing to a loan in the first place.

#### B.  Presumption of Regularity

The Department asks the Court to give it the presumption of regularity, *see* ECF No. 79 at 15-17, but it never wrestles with the numerous inconsistencies in its own record, as outlined

---

[7] Because the underlying loan and its validity are subject of *Weise II*, Plaintiff does not address the loan and related issues in detail.

above. *See also, e.g.,* ECF No. 79 at 9, n.8 (July and August WPC letters didn't reflect correct amounts/ongoing Social Security offsets, and gave Weise wrong contact information). Individually, each might of these might be harmless standing alone, but cumulatively they undercut the Department's claim that this record is reliable.

### C. Precedent

The Department principally relies on two cases—*Hymas* and *Cors*—in support of its arguments on summary judgment. *See Hymas v. United States Dep't of State*, No. 3:23-CV-00336-DCLC-JEM, 2025 WL 3650951 (E.D. Tenn. Dec. 17, 2025), appeal filed Feb. 19, 2026 (No. 26-5137); *Cors v. United States*, No. 12 CIV. 2265 LAK KNF, 2013 WL 6816696 (S.D.N.Y. Dec. 26, 2013). Neither applies with serious force.

For one thing, the *Hymas* plaintiff took out a loan for the cost of a one-way flight ticket ($1,600). More important, the plaintiff's APA claim argued that denials "apply only to loans issued under the Repatriation Loan Program ("RLP") and not to evacuation flights, and that passport cards may be denied only to sex offenders." *Hymas*, 2025 WL 3650951, at *5. That bears no resemblance to Weise's situation.

For another, *Cors* fails to help the Department for similar reasons. There, the plaintiff basically argued that denying a passport application based on his failure to repay a repatriation loan was improper, without citing any authority for that proposition. *See Cors*, 2013 WL 6816696, at *5; *see also* Pl.'s Opp'n, *Cors v. United States*, No. 12 Civ. 2265 (S.D.N.Y.), ECF No. 32 (plaintiff's opposition). Unlike here, there was no dispute that the Cors plaintiff had accepted a loan from the State Department. *Id.* ("It is not disputed that Cors received a repatriation loan… moreover, Cors acknowledged that he was obligated to repay").

## CONCLUSION

For the above reasons, Plaintiff respectfully requests that the Court grant Plaintiff's cross-motion, deny the government's motion, and order an effective remedy as to revocation and the passport application denial. Alternatively, because *Weise II* challenges the validity and enforceability of the underlying loan, the Court need not reach these issues in *Weise I* if it determines in *Weise II* that the loan is legally invalid or unenforceable. Without a valid underlying loan, the Department's revocation and denial decisions necessarily fail as well.


Dated:  August 11, 2026                                    THE ATLANTIC FOUNDATION
       Brooklyn, NY



By:  ___/s/  Sami Elamad_____


Sami Elamad
450 Lexington Ave., #69
New York, NY 10163
Tel. (646) 685-3954
Fax (646) 712-9501
sami@the-atlantic-foundation.org


*Pro Bono Attorneys for*
*Plaintiff Wolfgang Weise*